SIDNEY S. HARTSHORNE ET AL. *v.* JOSEPH S. Ross, Administrator, etc., of WARREN HARTSHORNE, Deceased, ET AL.

(No. 7,014.)

1. The testator's will is to be construed by the laws in force at the time of his decease.
2. A widow refusing or neglecting to take under her husband's will, is entitled to the same proportion of his personal estate as if he had died intestate.
3. When the husband dies without issue the wife takes all the personal estate, subject to distribution, as next of kin.

GENERAL TERM.—Proceeding in error to reverse a decree rendered by STORER, J., at special term of January, A. D. 1858, reported page 15. Proceeding to obtain a judicial construction of the will of Warren Hartshorne, deceased. The plaintiffs claiming to be residuary legatees under the last will and testament of Warren Hartshorne deceased, brought their original action against the defendants, Ross and wife, as administrators with the will annexed, of the estate of said deceased, for an account of the property which had come to their hands belonging to said estate, and for payment of the sum which might be found due to complainants, and to enforce the performance of the trusts created by said will.

It appears from the petition, answer, exhibits and testimony taken in the cause, that on the 29th day of January, 1848, Warren Hartshorne, then a resident of the county of Hamilton, State of Ohio, made his will therein, in all respects duly *executed* and *published*, according to the *act* then in force, as also the present law, by which he devised and bequeathed his estate as follows:

1st. "To my dearly beloved wife, Ann, *in lieu of her dower,* I will and bequeath the one-half of all my property, both real and personal, that shall remain after paying out all the legacies and bequests hereinafter named, and bequeathed by me in *items* 2d, 3d, 4th, 5th, and 6th, of this, my last will, etc., to have and to hold the same during her *natural life,* and at the death of my said wife, the real estate aforesaid, and such part of the personal property, or the proceeds thereof, as may then remain unconsumed and unexpended, I will and bequeath to my brothers and sister, Daniel and Ebenezer Hartshorne, and Esther Fuller, to be equally divided between them, share and share alike; and in case of the death of either my said brothers or sister, then the said share of the deceased to go to the lawful heirs of said deceased."

Item 2d gives, for benevolent and pious uses, to certain Bible, education, tract, missionary, and other benevolent and religious societies, *one hundred dollars each,* "to be paid out of the *first* moneys collected out of my estate after my decease."

Item 3d. . . . .

Item 4th. "I will and bequeath to my step-daughter, Jane Douglass Anderson, $1,000."

Item 5th. "To my namesake, Warren Hartshorne, son of my nephew, Sidney Hartshorne, $500," etc.

Item 6th. "To each of my half-brothers, Jonas and Calvin Hartshorne, and Susan Kendall, and Sarah G. Pateridge, $500," amounting in the aggregate to $4,200.

Item 7th. "All the remainder of my property I will and bequeath to my brothers and sister, *Daniel* and Ebenezer Hartshorne and Esther Fuller, to be equally divided between them."

Item 8th. "The house and lot which I now own in Walpole, Mass., in which my sister Esther now lives, is to be part of her portion, valued at $800, and is not to be sold during her life, but to go to her heirs."

The will then provides for the payment of debts before

any division shall be made, or legacies paid, and appoints the testator's wife, Ann Hartshorne, executrix, etc.

That on the 13th day of January, 1855, the testator made a codicil to his will, duly signed and sealed by him, attested by three witnesses, and published, and declared to be the *first codicil* to the testator's last will and testament, by which, to " avoid misunderstanding, there being improvements made by me on the lot on which I now reside, in Clermont county, Ohio (deeded to my wife, etc.), I bequeath to her all the houses and improvements, etc., made by me on the said lot, etc.; also, to my dear wife and her heirs forever, all the furniture, in said dwelling, etc., all fuel and provisions, all my horses and harness, etc., and all my pleasure carriages, stock, farming and other utensils, etc., upon the premises, to have in addition to my bequests to her, in my last will and testament, made in 1848."

The testator died on the 10th day of March, 1855 *without issue*, leaving his wife, *Ann*, surviving, who caused the will to be admitted to probate and record in Hamilton county, on the 4th of May, 1855, and took out letters testamentary thereon. Afterward, and within a year from such probate, the widow appeared before the probate judge, renounced the provisions made for her under the will, and elected to take such provision as was made for her *by law*, instead thereof.

As executrix, the widow caused an inventory and appraisement to be made of the personal estate of the deceased, from which it appeared that the personal estate situate upon the premises, in Clermont county, and which had been bequeathed to the widow, was of the value of $1,024.62, and the other personal property of the value of $38,095.96, all of which came to her hands as executrix, in all $39,120.58.

That on the 14th November, 1856, the widow intermarried with the defendant, Joseph S. Ross, who was subsequently duly appointed administrator *de bonis non*, etc., and filed an inventory of the property which came to his hands as such.

Ebenezer Hartshorne and Daniel Hartshorne (who, with Esther Fuller, are named as residuary legatees in the 7th item of said will), died before suit brought, leaving as their heirs and representatives, the co-plaintiffs of said Esther and husband, who united in the action to demand an account from the defendants, Ross and wife, of their proceedings as administrator and executrix aforesaid, and for settlement of the trust, claiming that the debts of the estate were substantially paid off. The defendants, by their answer, denied that plaintiffs were entitled to any account of said personal estate, or that the plaintiffs had any interest therein, averring that, by reason of the widow's declining to take under the will, she was entitled by law to the *whole* of such personal estate, after payment of debts, as though the testator had died intestate.

*Edward Woodruff & M. H. Tilden* for plaintiffs in error.

*Groesbeck & Thompson* for defendants in error.

SPENCER, J., delivered the decision of the court.

The case being submitted to the court at special term, it was held that the personal property after the payment of debts did, by operation of law upon her refusal to take under the will, *all* vest in the widow, and that she was not bound to account therefor or for any part of said property, nor the administrator to any one else but herself alone. And accordingly judgment was rendered for the defendants with cost. To reverse which is the object of the present petition.

What was the *value* of the testator's *real* estate, or whether the provision made by him for his widow under the will was *liberal* or *otherwise*, or whether the decision rendered will have the effect to defeat wholly or in part the bounty intended for the several legatees, the case presents us with no means of judging, and perhaps we are not concerned to *know*. The rights of the parties depend wholly upon the construction of the general law as applicable to cases of

*election*, or *non-election*, by widows for whom provision may be made under the wills of their husbands, and should be decided, without regard to the hardships or otherwise of the particular case. And here it may be allowable to say, that it is much to be regretted that a law of such general concern, and upon which so much depends, should not have been so framed, as to be in all respects free from ambiguity and doubt, both as to its *letter* and *spirit*.

In the consideration and decision of the case two questions arose and were disposed of, which it is necessary again to consider.

I. Whether the rights of the parties were to be governed by the law in force at the time when the original will was executed and published, or by the law in force when the testator died.

II. Whether under either law the widow is entitled to a distributive portion of *all* the personal estate, remaining after the payment of *debts* (without regard to legacies), as though the testator had died *wholly* intestate, or only to such portion thereof as may remain for distribution, after satisfying the other requirements of the will, and as to which only he becomes *intestate* by the election of the widow.

First. Upon the first of these questions the court held that the rights of the parties were to be determined by the law in force when the testator *died*, which was the statute of wills passed in 1852, and not by the amendatory statute of 1846, which was in force when the will was made. In this, we think the decision of the court was right.

The will act of 1852 purports to be *prospective* in its operation. So far as the *authority* to make a will and the mode of its execution are concerned, its provisions are but *re-enactments* of the law of 1840. The first section in each act declares that any person of full age, etc., having an interest in lands, etc., or any goods, etc., or other property of any description, *may give* and devise the same to any person by last will and testament lawfully executed; subject nevertheless to the rights of creditors, and to the provisions of

this act, and of an act entitled, "an act to restrain the entailment of real estate." The *second* section of each act provides in the *same language,* how such wills shall be *executed.* So that a will properly executed under the act of 1840, is taken up and carried along by the act of 1852, although the latter act in express terms repeals the *former.* Had the *mode* of execution in the *latter* differed from the *former,* or the *right* to *give,* been in any wise *restricted* by it, there can be no doubt that by the repeal of the former law, wills executed under it would have either *wholly* fallen, or as the case might be, failed to the extent of the restriction imposed by the *latter,* unless brought within some *saving* clause. For the power to devise by will is not of *common right,* it is a sheer creature of the statute, and the repeal of an *enabling* act makes *void* all things done under it, except where rights have become actually *vested* thereby. Now the law of 1840, as modified by an amendment in 1846, differs from that of 1852, as to the matter under consideration, in very essential particulars.

I. By the law of 1840, it is enacted, (sec. 45,) that "if *any* provision be made for a widow in the will of her husband, she shall within *six* months after probate of the will make her *election,* whether she will take such provision, or be endowed of his lands. But she shall not be entitled to *both,* unless such appears plainly by the will to have been the intention of the testator."

By the law of 1852, section 43, such election may be made at any time within *one year* from the probate of the will.

II. By the law of 1840, as amended in 1846, if the widow *fail* to make such election within the time limited, she shall *retain* her dower, and such share of the personal estate of her husband, as she would be entitled to by law in case her husband had died intestate, *leaving children; i. e.,* one-half of the first $400, and one-third of the residue.

By the law of 1852, the words, *leaving children,* are omitted,

which in a case of *intestacy*, without children, would give the widow the *whole* personalty.

The law of 1852 has, therefore, modified and *restricted* the *power* of the testator, attempted to be exercised by him under the law of 1840–46, so far as to give her twelve months instead of six, within which to make her election, between the provisions of the law and the provisions of the will, and so far also as very essentially to enlarge those provisions of law in case she elects to waive them.    The *effect* of these changes may be, in a case like the present, and in many others likely to occur, to produce a result wholly unexpected to the testator, at the time of making his will, and, perhaps, wholly to thwart his real purposes.    Yet should such be the case, it is to be presumed, that he has rather yielded to the change thus made, than persisted in his original design, else he would have made, by an alteration of his will, such changes as the law may have rendered necessary.    Be this as it may, the rules of property are, at all times, subject to change, and the legislative authority to restrict the power of alienation by *will*, or to impose rules for distribution after the death of its owner, will not be questioned by any one.    The only question we have to consider is, whether the authority has been exercised, in the passage of the law of 1852.    We have already seen that by this law, the act of 1840 and 1846, and the authority therein given, are absolutely *repealed*, and a consequent *change* in the rights of the parties under this will, unless the *saving* clause of the act of 1852 can be so applied, as to leave them wholly under the governance of the laws of 1840–46.    The language of the saving clause is as follows: "Provided that all rights that have *accrued* under the provisions of *said laws*, shall not be affected by the repeal thereof."    The laws thus alluded to are not merely the wills acts of 1840 and 1846, but several *amendatory* acts, passed in 1848, 1849 and 1851.    The first of which provided for the establishing of *spoliated* wills (not before then provided for).    The second for the protection of purchasers, under foreign wills, admitted to record in

Ohio, and afterward set aside; and the third for the protection of purchasers from the heirs, on the rejection of a foreign will, afterward admitted to probate. And under all *three* of which, as well as under the original wills acts, rights might well have been supposed to have *accrued* or become *vested.* But the saving clause does not extend beyond *rights accrued* or *already existing*, not *accruing* or such as *may become* vested thereafter. The rights here alluded to can not mean the right of the testator to make a different distribution of his property, under a *former* will, from what he would have been allowed to do under the act just passed, or to save wills which had not yet become *operative* by the *death* of the testator, and under which no rights could be justly said to have *accrued.* If it had been the *intention* of the legislature to save, from the operation of the act of 1852, wills executed under *former laws*, not yet operative, it could have been easily done, by saving wills already executed, requiring them to be construed in connection with the law in force, *when made.* As to any other *rights* than those of the testator himself there is no possible propriety in applying the expression "rights *accrued*," to the *intended* beneficiaries under a will, which could create no rights until the *death* of the *testator*. It is not deemed necessary to say more upon this point. But it is proper to say that the legislature seem to have used this expression in a limited sense by *guardedly* omitting, from this saving clause, expressions used in the saving clause of the former wills act; and the continuance of which in this might, perhaps, have admitted of a construction such as the plaintiffs' counsel now contend for. The wills act of 1840, which repealed *all* former acts upon the same subject, contains *this* saving clause: "provided, however, the repeal of said acts shall not affect any *act done*, or any right or estate *accruing* or *accrued* or any suit or proceeding had or commenced." Thus saving not only rights *accrued* but rights *accruing* and *acts done*, under former laws. This change of phraseology

could not have been *accidental* in the *remodeling* of the prior act, but was studied and *designed*.

II. The *second* and more difficult question to be disposed of, is, whether under the law of 1852, the widow of the testator (Warren Hartshorne) is entitled to distribution of *all* his personal estate remaining after the payment of debts (without regard to legacies) as though he had died wholly intestate; or whether she is entitled only to the *remainder* thereof after satisfying the other requirements of the will, and as to which only the testator has become *intestate* (or can be said to have *died* intestate) by reason of the widow refusing to receive the provision made for her by the will.

The language of the law is as follows: Sec. 43. " If any provision be made for a widow in the will of her husband, she shall, within one year after probate of the will, make her election whether she will take such provision, or be *endowed* of his *lands;* but she shall not be entitled to *both,* unless it plainly appears by the will to have been the intention of the testator that she should have such provision in addition to her dower."

Sec. 44. " The election of the widow to take under the will, shall be made by her in *person,* in the probate court, etc., and it shall be the duty of the court to explain to her the provisions of the will, her rights under it, and by *law,* in the event of her refusal to take under the will," etc.   " If the widow shall fail to make such election, she shall *retain* her dower, and such share of the personal estate of her husband as she would be entitled to by law, in case her husband had died intestate," etc.

Now it can not be denied that the *literal* construction of the 44th section is such, that the widow refusing to take under the will, is not only entitled to her dower, but to such share of the personal estate of her husband, as she would be entitled to by law if he had died *intestate*—not intestate as to part of his property, but *wholly intestate.*   To determine what such share is, we must refer to the 180th section of the law regulating the settlement of estates (Swan

Stat. 389) which prescribes, "when the *intestate* shall not have left any legitimate child, etc., the widow shall be entitled to all the personal estate, as next of kin, which shall be subject to *distribution,* upon settlement of the estate; and if the intestate *shall* have left such child, the widow shall be entitled upon distribution, to one-half of any sum not exceeding $400, and to one-third of the residue of the personal estate, subject to distribution." If the legislature had meant intestate only as to so much of his property as was not disposed of by his will, the matter could have been unequivocally expressed (and much more simply) by using, instead of the word intestate, the phrase, "*without making such provision.*" So that the sentence would have read, "she shall have such share of the personal estate of her husband, as she would be entitled to by law, in case her husband had died without making such provision; or, perhaps still more clearly, "after satisfying the debts and other bequests in the will."

The *propriety* of a *literal* construction of this section, seems to result from the duty which it imposes upon the probate courts of instructing the *widow* (when she comes to make her election) as to her rights under *the law.* If such courts might pass by the plain words of the law, and enter upon the field of *construction,* the rights of widows, instead of receiving *protection* from such *instruction,* would be constantly *jeopardized.*

But again: so far as regards the *quantum* of interest in her husband's estate, which the widow becomes entitled to, on her *refusal* to take under the will, it is the same under the law of 1852 as under that of 1840, and should receive the *same construction.* Now, the law of 1840 is the first one which ever assumed (in terms) to give the widow (in case she refused to take under the will) *anything in addition to dower.* From the passage of the ordinance of 1787, through all the territorial and State legislation, down to 1840 (a period of 53 years) the laws on the subject of *dower,* distribution, and wills, were substantially the *same.* They all gave

to the *widow*, dower, in all lands of which her husband *died seized*, or was at any time during coveture seized as of an estate of inheritance.    They all gave to *husbands* power to make wills of all their estates, subject only to the rights of creditors and the ordinary right of dower in *the lands*.  They all gave to the widow a distributive share of the estate in cases of *intestacy* only.    The last act, prior to 1840, was that of 1831 (Chase, 1786).   In section 4, it provided "that in case of a devise in *lieu of dower*, if the widow shall within six months after probate, etc., make known to the court, etc., her election to relinquish her *dower*, and claim under the *will*, then her election so made as aforesaid, shall be entered, etc., and her right of *dower*, etc., shall be barred; and if any widow fail to make her election, she shall retain her *dower*, and take nothing by the will."    Under this law, it will be observed that nothing but the right of *dower*, was in any wise involved in the matter of an *election* presented to the widow;  as to *personalty*, she was in nowise affected, either by an *election* to take, or a *refusal* to take under the will.   Whether she elected to take in lieu of *dower*, or refused, if the husband died intestate as to any part of the *personalty*, she was still entitled to her *distributive* share of that.   If then the law of 1840 intended no more than that the widow, in case she failed to elect under the will, should have her dower, and only *such part* of her husband's personalty as should *not* have been disposed of by him, it was wholly a work of supererogation to declare, that in such event, she *should* have her distributive share, as though her husband had *died intestate*.    For that was already provided for by the *administration law* in reference to the estates of *intestates*.    It can not have been enough to declare, as under the law of 1831; "she *shall* retain her *dower*, and take nothing by the will."    Where new phraseology is incorporated into the law, we are to presume that it was intended to have some *efficient operation*, according to its terms, and not to express a truth already *established*, and that, in the present one is, "the widow shall not only retain her dower but such share of his

personal estate as if he had died *intestate*, or without making any will."

The further *history* of legislation on the subject not only confirms this view of the legislative intent, but seems to furnish a legislative declaration of such intent.

In March, 1842, an act was passed reciting that "whereas doubts have arisen under the act of 1840, etc., whether, when a widow fails to elect to take under a will in lieu of dower, she shall be entitled to share in the personal estate to the exclusion of legatees, or only a share in such of the personal estate as remains unbequeathed, and whereas it is proper that such doubts be removed; therefore,

"Be it enacted, etc., That nothing in said section contained, shall be so construed, as to vest in the widow personal estate that is lawfully bequeathed by her husband to other persons; but in all cases in which the widow fails to make election to take under the will of her husband in lieu of dower, as is provided in said act and section, she shall retain her dower in his real estate, and her distributive share in the personal estate, not disposed of by the will." Vol. 40, p. 55.

The terms of this act are explicit enough, and leave no doubt that at that time (1842), the legislature did not intend that the widow's election should in anywise interfere with her husband's will, further than as regards her *own dower.* But in the *very next* year, the legislature, not satisfied with the *declaratory* (or perhaps we should rather say *amendatory*) act of 1842, passed another act repealing the same, and declaring that said 46th section "be, and the same is hereby *revived.*" Vol. 41, p. 50. Now, what is this, but rejecting the construction, put upon the law of 1840 by the legislature in 1842, and returning to the frame of the law as it *literally* stood? It surely can not be said that the declaratory act of 1842 was itself a work of *supererogation*, if it properly construed the *original act*, and if it did *not* so *properly* construe it, its repeal was absolutely *necessary.*

But, as if to show still further its sense of the right of the widow, to resist the operation of the will in such cases, the

legislature, in 1846, took another step, and by a further amendatory act then passed, enacted (Vol. 44, p. 79), "That if the widow fail to make her elction to take the provision made for her in the will of her husband, etc., or if *no provision* be made for her in the will of her husband, she shall have her dower, and such share of the personal estate of her husband as she would be entitled to by law, in case her husband had died *intestate leaving children.*" This is the *first* and *only* law which *ever* gave in terms to the widow, the power to interfere with, and to a certain extent defeat her husband's will, in a case where he had made her *no* provision whatever, whether in lieu of *dower* or otherwise. Under its operation, if the *husband failed* to provide for her by will, she was entitled to a certain distributive share of his estate—or if he *did* provide, she was *equally* so entitled. Either alteration defeated his will to the same extent. It will be perceived then, that if the husband should have devised away his whole estate (excepting dower), his wife, notwithstanding the will, would be entitled to her distributive share of the *personalty*, as though he had died *intestate.* And so also could she, if he *had* made provision for his wife.

This again manifesting the legislative intention that the construction to be put upon the words "*dying intestate,*" should be dying *without a will*—or *wholly* intestate.

Next comes the law of 1852 (now in force), which is a *revision* of the act of 1840, with its amendments, and in the consideration of which, the construction which had been put upon this section of the law of 1840, by successive acts, must have been apparent to the legislature. If then, such construction had *not* been *acquiesced* in, it seems difficult to understand *how* the legislature could have *re-enacted*, in the very same terms (only with additional precautions to secure to the widow a *knowledge* of its provisions, through the instruction of the probate court), the same provisions which had been made for her under the law of 1840.

We do not desire, in this opinion, to stand upon the construction which may have been put upon laws of a similar

character in other States, with whose history we are not perhaps sufficiently *familiar*, and whose construction may depend upon the particular phraseology in which they may have been couched, although it would seem, as if in some of the States (we refer especially to Virginia, Kentucky and Alabama), laws apparently similar to ours, have received the construction we have been compelled to put upon the language of our statute.

Neither do we wish to express any opinions as to *whether* under the present law a widow *can* make an *election*, to take *against* the will, and in a case like the present, where there are no children of the testator, defeat it wholly as to *personalty*, and take *all* at law, in a case where the husband makes no provision whatever, or a provision in *addition* to dower. We confine ourselves to the case as *it stands*, where provision has been made for a widow in *lieu of* dower, when an *election* may be made by the widow, whether she will take such provision or not; and when, having refused to take such provision, the law declares she shall have such of the personalty as she would have taken had the husband died *intestate*.

We are aware of the difficulties which beset us in giving a construction to the law in accordance with its plain and literal terms; and a portion of the court, at least, have been sorely pressed by the *incongruities* and inconsistencies in our legislation upon this subject. The first section of the *wills act* declares, that "any person of full age, etc., having an interest in lands, goods, or any other property, may give and devise the same by last will and testament, subject to the rights of creditors, and to the provisions of *this act*." *Here* is the gift of a general power to devise. The 43d section declares, that "if *any provision* be made for a widow in the will of her husband, she shall make her election, whether she will take such provisions, or be *endowed* of his *lands*—but shall not be entitled to *both*, unless such appears plainly to have been the *testator's intent*." So far, it would seem, that the widow can not interfere with the power given to the husband to devise away *all* his property, saving

the widow's right of *dower* in *his lands* only. But, in the 44th section, it is declared, that if she *fail* to make *such election*, she shall retain her *dower*, and such share of the personal estate of her husband, as she would be entitled to by law, in case her husband had died *intestate*. Now an election is not expressly given to the widow, except in a case where *some* provision is made for her by the will, in which case the law presumes it to have been made in *lieu of dower*. If the husband makes *no provision*, or makes a *provision* expressly in addition to *dower*, the law is silent as to the widow's right, and saving her *dower in lands only*, might be construed so as to give the husband power to grant all else away. The consequence would be, in a case like that before us, where there are *no children*, and the husband had a large amount of real and personal estate, if he desired to make liberal bequests to his brothers and sisters, or for other uses, he must either make *no bequest* to his widow, or make *some* provision in *addition* to dower—on the other hand, if he desires to make a liberal provision for his widow, in *lieu of dower*, and greater than she could have received as *doweress* merely, he can not do so—his intention would be defeated by an election of the widow to take her *dower*, and the whole *personal* estate beside—thus entirely defeating the will.

Again, *take this very case*: a husband has a large amount of real and personal estate, say valued at $40,000 each—he gives *half* of each whether for life or in fee, in lieu of *dower*, which is but a *third* of the *land* alone for life. If the *personalty alone* had been given in *lieu* of dower, the law says she shall not have *both*, yet by making an election she not only takes *both*, but the *residue* of the personalty besides; whereas, had the husband given her one-half of the personalty in addition to *dower* only, it is *all* that she could have claimed.

But still further, had the testator in the present case left children, whether by this or another wife, dependent upon the care and bounty of his wife, for both of whom he had supposed the provision adequate, his widow electing to take under this will, would have received but the one-third

of his personal estate, over the sum of $400, for the support of both herself and children, and the will would have been good for the residue; because, in that event, taking under the *law,* such only would have been her distributive share; and thus is presented this strange anomaly, that a man leaving a wife and helpless children may cut them all off with *one-third* of his estate (or if he leaves no land in which dower can be had, cut them off entirely); whereas, if he leave wife *alone,* she may, at her option, take his *whole* estate, even though he may have made a liberal provision for her. And under *our* construction of the law (which has been given), should a man have *no* land, and nothing, therefore, of which his widow could be endowed, but should leave a *large* personal property, he could make no bequests whatever that his widow could not defeat, because by an *election* not to take under the will, she shall have *all.*

These are some of the difficulties and incongruities which the law seems to present in its literal construction—and they have so pressed upon us (a part of the court at least), as to induce us to deliberate anxiously before adopting such a construction. But it is not the business of the judges to reconcile inconsistencies or oppose a stumbling block in the way of the legislative intent; their duty is to ascertain what that intention may be, from the plain words of the law, and the construction which the legislature may have put upon them. And when that intent is ascertained, to give the law effect. If a remedy be proper the law making power alone could and must apply it.

Having thus decided that the will of Warren Hartshorne is to be governed by the law of 1852, and that by that law his widow was entitled to elect whether she would take under his will or retain her *dower,* and such share of his personal estate, as she would have taken, had he died *wholly* intestate, and having made her election to take under the *law,* it remains only to add, that by the 180th section of the act for the settlement of intestate's estates, the provisions of which have been already anticipated, the widow is entitled

(the deceased having left no children) to his whole *personal* estate subject to *distribution, i. e.,* after payment of debts, and that the plaintiffs have no *interest* therein. Such being the decision of the court at special term, the judgment must be *affirmed.*

Judgment affirmed.